IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RIGOBERTO PORRAS,                                3:13-cv-00699-BR

                    Plaintiffs,                  OPINION AND ORDER

v.

VIAL FOTHERINGHAM LLP and
ANDREA MONTAG,

          Defendants.


**BRET A. KNEWTSON**
3000 N.W. Stucki Place
Suite 230 M
Hillsboro, Oregon 97214
(503) 846-1160

**MARK G. PASSANNANTE**
Broer & Passannante, PS
1001 S.W. Fifth Avenue
Suite 1220
Portland, Oregon 97204
(503) 294-0910

          Attorneys for Plaintiff

1 - OPINION AND ORDER

SHANE P. SWILLEY
ROBERT E. SABIDO
Cosgrave Vergeer Kester, LLP
500 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204
(503) 323-9000

Attorneys for Defendants

BROWN, Judge.

This matter comes before the Court on Plaintiff's Motion
(#103) for Partial Summary Judgment and Defendants' Motion (#109)
for Partial Summary Judgment.

For the reasons that follow, the Court **GRANTS in part** and
**DENIES in part** Plaintiff's Motion for Partial Summary Judgment
and **GRANTS in part** and **DENIES in part** Defendants' Motion for
Partial Summary Judgment.

<u>BACKGROUND</u>

This once-straightforward debt-collection matter that began
in 2009 and initially revolved around the nonpayment of less than
$1,000 in homeowners' association assessments is now before this
Court on the parties' Cross-Motions for Partial Summary Judgment
as to Plaintiff's unfair debt-collection practices claims in
which Plaintiff asserts he is entitled to economic, noneconomic,
and punitive damages well in excess of $1,000,000.  What should
have been resolved by the parties professionally and

2 - OPINION AND ORDER

pragmatically on the then-uncomplicated issues is now before this Court as a two-year-old unfair debt-collection practices battle royale in which the parties' claims are myriad and the attorneys' meters continue to run.

The following facts are undisputed and derived from the parties' submissions on summary judgment:

In October 2004 Plaintiff purchased a home in the Oak Hill Settlement in Forest Grove, Oregon. Oak Hill is a planned community development created in 2003 by Skyline Development, Inc. Skyline filed a Declaration of Covenants, Conditions, and Restrictions for Oak Hill (CCRs) with Skyline named as the Declarant and signed by David Huttula as President of Skyline. The CCRs created the Oak Hill Settlement Owners' Association (the HOA) and reserved to Skyline administrative control of the HOA and the right to appoint between one and three persons to serve as the HOA's Interim Board of Directors to govern the HOA.

Under the CCRs all purchasers of property in the Oak Hill Settlement become members of the HOA. Notice of a meeting of the Board of Directors "shall be posted at a place or places on the property" at least three days prior to the meeting or otherwise provided by a method reasonably calculated to inform lot owners of the meeting.

All members of the HOA are responsible for paying periodic assessments established by the HOA. In addition, special

3 - OPINION AND ORDER

assessments may be ordered by a majority vote of the HOA's Board of Directors.  Assessments collected by the HOA are to be used "solely for the operation, care and maintenance of the Oak Hill Settlement" and are primarily used for HOA administration, insurance, management, and operation and maintenance of common areas within Oak Hill.  Although none of the HOA assessments are used for any owner's individual lot, each owner in Oak Hill has an interest in the common areas appurtenant to the owner's lot.

Article 10.8 of the CCRs contains provisions regarding an owner's default in payment of HOA assessments.  If a lot within Oak Hill is owned by multiple persons, the owners of the lot are jointly and severally liable for unpaid assessments.  The HOA Board of Directors has the power to adopt a resolution to impose late fees, fines, and penalties for delinquent HOA assessments.

If at any time any assessment is delinquent, the HOA, "by and through its Board or any management agent," may file a lien against the delinquent owner's lot.  After a lien is filed, "such lien shall accumulate all future assessments or installments, interest, late fees, penalties, fines, attorneys' fees (whether or not suit or action is instituted) and other appropriate costs properly chargeable" to the owner by the HOA until such amounts are fully paid.

On February 27, 2007, Huttula signed the Bylaws of Oak Hill Settlement in which Huttula is identified as "President" of the

HOA.  Although there is not any evidence in the record concerning
when Huttula was appointed as President of the HOA, the HOA was
under the control of the "Declarant" Skyline and Huttula was
President of Skyline during the relevant period.

The HOA engaged Northwest Community Management Company to
serve as the management company for the HOA.  Huttula signed that
contract on behalf of the HOA.  The contract includes a schedule
of fees that Northwest Community Management charges the HOA for
particular services, including a schedule of fees specifically
relating to collection of unpaid HOA assessments.  For services
that are not specifically listed, the fee schedule provides such
services will be billed based on listed rates for the individual
components of the service.

On April 7, 2009, Huttula, as President of the Board of
Directors, signed a resolution concerning collection of unpaid
HOA assessments (Collection Resolution).  The Collection
Resolution describes the procedures to be followed in collecting
unpaid HOA assessments and provides "all legal fees and costs
incurred in collection of a delinquent account shall be assessed
against the delinquent Owner and shall be collected as an
assessment."  There is not any evidence in the record as to
whether members of the HOA were given notice of the Collection
Resolution.  That same day Huttula signed on behalf of the HOA an
agreement with Vial Fotheringham to represent the HOA in

5 - OPINION AND ORDER

collecting delinquent assessments.

As noted, Plaintiff purchased a home in Oak Hill in October 2004.  Plaintiff fell behind on his HOA assessments on April 1, 2009, and was sent a First Notice of Default on May 1, 2009. Plaintiff missed another HOA assessment on July 1, 2009.

On September 25, 2009, the HOA filed a lien on Plaintiff's property consisting of $158.00 in unpaid assessments, $62.00 in recording and mailing costs, and $190.00 in collection charges for a total of $410.00.

On December 7, 2009, Vial Fotheringham sent Plaintiff a letter informing him that his debt had increased to $837.24, including $489.00 in past-due assessments, late fees, and interest and $348.24 in attorneys' fees and collection costs. The letter instructed Plaintiff to direct all communication and payments to Vial Fotheringham and advised Plaintiff that Vial Fotheringham would assume the debt was valid unless Plaintiff notified Vial Fotheringham within 30 days that the debt was disputed.  There is not any evidence in the record that Plaintiff communicated to Vial Fotheringham that he disputed the validity of the debt within 30 days of the letter.  Moreover, Plaintiff continued to miss making his HOA assessment payments.

On June 1, 2010, Vial Fotheringham sent Plaintiff another letter informing him that Vial Fotheringham intended to commence a lawsuit against Plaintiff unless he paid the back assessments

in full or made arrangements for a payment plan within 10 days of the date of the letter.  The June 1, 2010, letter also advised Plaintiff that the amount owing had grown to $1,253.16 and included $674.28 in past-due assessments, late fees, and interest and $578.88 in attorneys' fees and collection costs.

Sometime in June 2010 Plaintiff and Vial Fotheringham agreed Plaintiff would pay $120.00 per month until the debt was settled and Vial Fotheringham would receive a $25.00 monthly fee for processing and maintaining the payment plan.  As a condition of entering into the payment plan, Plaintiff was required to sign and to return to Vial Fotheringham a confession of judgment that Vial Fotheringham could enter against Plaintiff in the event of a default.  Plaintiff did not sign and return the confession of judgment.  Beginning in June 2010, however, Plaintiff made four monthly payments of $120.00 each.  Vial Fotheringham charged the $25.00 payment-plan fee when Plaintiff made the September and October 2010 payments.

Plaintiff's payments ceased in November 2010.  On November 24, 2010, Vial Fotheringham sent Plaintiff another 10-day notice letter informing him that Vial Fotheringham intended to proceed with a lawsuit unless Plaintiff paid the money he owed in full or made arrangements for a payment plan.  On November 24, 2010, the amount owed was $1,539.70, which included $696.14 in past-due assessments, late fees, and interest and $843.56 in

7 - OPINION AND ORDER

attorneys' fees and collection costs.

On December 29, 2010, Vial Fotheringham filed a lawsuit on behalf of the HOA in Washington County Circuit Court seeking all assessments and charges that Plaintiff owed to the HOA.  Although Plaintiff was properly served with the complaint, he did not answer or otherwise make an appearance.  Accordingly, the court entered a default judgment on May 17, 2011, in the amount of $2,150.47, including $762.35 in principal, $17.62 in "judgment interest," $620.50 in court costs, and $750.00 in attorneys' fees.  The $750.00 the court awarded as attorneys' fees represented a write-down of $531.48 from the $1,281.48 that the HOA requested.  The judgment permitted the HOA to seek a supplemental judgment for recovery of any attorneys' fees incurred in collection of the judgment.  The judgment included all assessments and late fees owed by Plaintiff to the HOA through May 4, 2011.

By September 2011 Vial Fotheringham had collected the full amount of the judgment by garnishing Plaintiff's wages.

Sometime in the fall or winter of 2011 Plaintiff decided to sell his home in Oak Hill.

On October 13, 2011, Plaintiff contacted Vial Fotheringham to inquire whether he owed any more money.  Vial Fotheringham informed Plaintiff that he still owed a total of $1,679.85 in post-judgment accruals, including $233.37 for assessments and

8 - OPINION AND ORDER

related charges and $1,446.58 for attorneys' fees and costs.
Plaintiff offered to pay that amount with a payment plan under
which Plaintiff would pay $100.00 per month, but the HOA insisted
Plaintiff pay $200.00 per month.  The parties could not agree on
a new payment plan.

On December 9, 2011, the HOA, through Vial Fotheringham,
submitted a motion for a supplemental judgment seeking $1,137.92
in additional attorneys' fees and costs incurred in collecting
the judgment.  The record does not indicate why this number is
lower than the amount that Vial Fotheringham demanded from
Plaintiff in Vial Fotheringham's October 13, 2011, letter, but
the $541.93 difference between the October 13, 2011, accounting
and the amount sought in the December 9, 2011, motion is roughly
the same (with interest) as the Washington County Circuit Court's
May 2011 reduction of $531.48 in attorneys' fees.  On December
14, 2011, Plaintiff, through his counsel Bret Knewtson (who also
represents Plaintiff in this matter), objected to the HOA's
motion for supplemental judgment.  On December 20, 2011, however,
the court entered a supplemental judgment for the full amount
requested by the HOA.

On December 21, 2011, unaware that the court had entered a
supplemental judgment the day before, Knewtson and Defendant
Andrea G. Montag, then an attorney at Vial Fotheringham, engaged
in settlement discussions.  After the discussions were held,

9 - OPINION AND ORDER

Montag sent Knewtson an email memorializing a "counteroffer" by which Plaintiff would pay a total of $733.37 ($233.37 in assessments and related fees and $500.00 in attorneys' fees and costs) over the course of two months and in two separate payments.  In addition, Montag stated Plaintiff would be responsible for payment of all future HOA assessments beginning January 1, 2012.  Montag instructed Knewtson to respond to her by December 30, 2011, with Plaintiff's decision about whether to accept or to reject the offer.

Knewtson responded to Montag's counteroffer with his own counteroffer:  Plaintiff would pay the $733.37, but he would only have to make a $200 payment in January and pay the remainder before the end of April 2012.  In addition, Knewtson agreed Plaintiff would pay "the $48.50 [HOA] due for the regular Jan[uary] to April dues at the beginning of January."  Although the HOA had previously notified all owners that the 2012 assessments had increased to $70.00 per quarter, Montag did not bring this fact to Knewtson's attention.

Montag replied, however, that she was reluctant to accept a counteroffer by which Plaintiff could have until the end of April to complete payment because of the substantial reduction in attorneys' fees offered by Vial Fotheringham.

Knewtson responded to Montag by disagreeing that an April payment deadline was too far away.  Montag replied, however, that

if Plaintiff wanted to wait until April to finish paying, he
would have to set up a plan that would cost approximately $350.00
with a $25.00 per month maintenance fee.  Montag again offered to
permit Plaintiff to pay the $733.37 in two installments in
January and February without the additional expense of setting up
a formal payment plan.

Knewtson did not respond until Friday, December 30, 2011,
nine days after the initial email exchange.  At that time
Knewtson informed Montag that Plaintiff "will make the two
payments.  Half, $366.69 in Jan[uary], and $366.69 in
Feb[ruary]."

On Tuesday, January 3, 2012, Montag wrote:  "To clarify, if
accepted, we will reduce this agreement to writing and your
Client must timely make these payments on an agreed upon date
. . . via certified funds."  Knewtson responded that the dates
for payment would be January 30, 2012, and February 29, 2012.

On January 4, 2012, Montag responded:  "One more thing,
we'll need to file a Motion to Stay the proceedings until the
funds we receive from your Client clear.  I'll incorporate it
into the Settlement Agreement.  Let me know what you decide."
Knewtson replied seven minutes later:  "I am not sure what you
mean by 'decide.'  If you are asking if I agree to the motion to
stay proceedings I don't see the point of that.  The agreement
would null the motion."  Montag responded:  "I'll prepare the

Settlement Agreement and send it to you.  Does that work?"
Knewtson replied "Thanks."

Two days later (January 6, 2012) Montag emailed Knewtson to
inform him that Montag had just received notice from the court
that it had entered the supplemental judgment in favor of the
HOA.  Montag informed Knewtson that she would "incorporate that
fact into any settlement agreement.  You can expect it today."
Approximately two hours later Montag sent the settlement
agreement to Knewtson and stated:  "I'll expect to receive it
from you, signed by your Clients, promptly."

Approximately 30 minutes later Knewtson replied:  "Please
forward what the court sent you on the fees."  Approximately one
hour later Montag emailed the supplemental judgment to Knewtson.

Nearly two weeks passed without comment from Knewtson.

On the morning of January 19, 2012, Montag emailed Knewtson
again:

> It has been nearly two weeks since I e-mailed you the
> Settlement Agreement as well as the Notice of
> Supplemental Judgment.  I am not in receipt of a signed
> Agreement from your Client.  That said, I will assume
> that your Client has not agreed to the terms of the
> Settlement and my only recourse is resume our
> collections efforts.  If this is not the case, I expect
> a response from you no later than the close of business
> today.

That afternoon Knewtson responded:

> My position is that we have an agreement that he will
> make the two payments.

> We never discussed waiving claims he has against the

> HOA or its agents so your settlement agreement does not
> reflect our agreement.  I think he has to appeal the
> supplemental judgment unless you voluntarily vacate it
> and withdraw your motion for fees.  I won't be back
> till [sic] 4.  Let me know your position.

Shortly after 4:00 p.m. that day Montag responded:  "The Settlement Agreement that I sent you is part of our standard agreement.  Does your Client care to strike that clause and does your Client otherwise agree to the other terms of the Agreement itself?"

One hour later Knewtson replied:

> The condition that if he misses a payment you get your
> judgment is not agreeable.  As well as para[graph] 2.4
> – he misses a future assessment payment all amounts are
> forgiven?  What amounts?  We never discussed any of
> that.

> Our deal is he makes the payments on the agreed amount
> and if he does not then you can sue him for whatever is
> left on the balance of the agreed amount.

Approximately ten minutes later Montag responded:

> The condition that if he misses a payment is
> essentially the same as us executing our judgment as it
> stands and protects my Client against the prospect that
> your Client fails to make a payment.

> Paragraph 2.4 also protects my Client against the
> prospect that your Client fails to pay future
> assessments.  Remember, your Client is already
> obligated to pay assessments.  All this clause does is
> add another layer of protection for my Client.

> Please review the Agreement in its entirety and let me
> know if and what your Client agrees to and present a
> revised Agreement that my Client may consider.

> Given that it has taken you nearly two weeks to
> respond, kindly respond promptly so that we may
> otherwise resolve this matter.

13 - OPINION AND ORDER

The next afternoon (Friday, January 20, 2012) Plaintiff paid
$48.50 to Vial Fotheringham as payment of his first-quarter 2012
HOA fees.  This payment of $48.50 was consistent with Knewtson's
representation to Montag on December 21, 2011, that Knewtson
believed the quarterly assessments for 2012 were $48.50.  As
noted, although Montag did not correct Knewtson, his belief is
inconsistent with the HOA's prior notice to all owners in Oak
Hill (presumably including Plaintiff) that the 2012 quarterly
assessments were $70.00.

That same day Knewtson emailed to Montag a document that
contained Plaintiff's understanding of the agreement.  That
document is not part of the record before this Court on summary
judgment.

On Monday morning (January 23, 2012) Montag responded:

> If your Client makes the payments on time and the funds
> clear, there should not be a problem with the Agreement
> I drafted and the clauses you addressed, below, would
> not be activated.  Regarding the provision that your
> Client must pay the entire amount of the judgment if
> your Client fails to perform, I must protect my Client
> from the prospect that your Client will again otherwise
> fail to perform its promises.  Regarding the provision
> that your Client keep current on its future
> assessments, I must again protect my Client from the
> prospect that your Client again otherwise fails to
> perform its promise to keep current with assessments
> that it is already obligated to pay.  In the Agreement
> you presented, your Client asks to be released from any
> liability through December 31, 2011 even if your Client
> fails to perform as agreed upon.  I cannot expose my
> Client to additional harm that it may experience as a
> result of your Client failing to perform its
> obligations.  Your Client's failure to pay its
> assessments and related fees are the sole reason your

> Client's account was turned over to this Firm for
> collections and a lawsuit ensued.  There are only two
> payments here, for an amount far less than the judgment
> we already obtained.  The terms of the Agreement are
> fair, the clauses do not change the material, agreed
> upon terms.  In the interest of settling the matter and
> to avoid the back and forth, let's proceed with the
> Agreement I drafted.
>
> Kindly respond promptly so that we may resolve this
> matter.

Knewtson did not immediately respond to Montag's email.

Two days later (January 25, 2012) Montag emailed Knewtson

again stating that she would "like to get this matter settled no

later than close of business on Friday, January 27, 2012.  If we

do not receive the signed Agreement from your Client by then, it

is null and void."

Knewtson did not immediately respond to Montag's email.

That same day (January 25, 2012), however, Plaintiff

(represented by Knewtson) appealed the Washington County Circuit

Court's entry of the supplemental judgment.

The next afternoon (January 26, 2012) Montag emailed

Knewtson:

> Our offices received a money order from your Client in
> the amount of $366.68.  No documents accompanied it and
> there is nothing in the memo line to indicate what the
> payment is for.  We will not process the check until we
> have received the signed Settlement Agreement from your
> Client, which I assume should accompany it.

Rather than reply in a manner consistent with a genuine

desire to clarify the record and to resolve his client's debt,

the following morning Knewtson responded:  "If you had to guess,

15 - OPINION AND ORDER

what would you guess the money is for?"  Later that afternoon
Knewtson emailed to Montag a proposed Settlement Agreement and
Release, which provided:

> In exchange for $733.37 paid by defendants to
> plaintiff, plaintiff [the HOA] releases defendants
> [Porras and Porras's wife, Maria Gonzalez] from any
> liability existing through December 31st, 2012 and
> plaintiff releases any liens against property of
> defendants.  Payment:  Porras and Gonzalez's
> will make two (2) payments by certified funds including
> money orders, with the first of $366.69 received no
> later than January 31, 2012 and the second of $366.69
> received no later than February 29,2012.

Approximately two hours later Montag responded:  "This is
not the Agreement I sent you."

Knewtson did not respond to Montag's email.

On January 30, 2012, Plaintiff located a buyer for his home
and opened an escrow account at First American Title Insurance
Company of Oregon.

On approximately February 3, 2012, First American requested
the HOA and Vial Fotheringham provide to First American an
accounting of the amounts that remained owing on the lien on
Plaintiff's home.

On February 6, 2012, The Management Trust (formerly
Northwest Community Management), on behalf of the HOA, sent a
summary of the amounts due and a ledger to Vial Fotheringham in
which The Management Trust represented that $451.91 was due to
the HOA through escrow even though only $326.91 was required to
release the lien.  The remaining $125.00 appears to be a transfer

16 - OPINION AND ORDER

fee paid to the HOA by the buyer of Plaintiff's home.

On February 14, 2012, Vial Fotheringham recorded Plaintiff's payment of $366.69 on its ledger of Plaintiff's account and in its trust-account records.

On February 21, 2012, Vial Fotheringham sent a "payoff" to First American.  On the first page of the payoff (which appears to be a summary of all amounts owed to Vial Fotheringham and the HOA), Vial Fotheringham represented a total of $2,474.80 was due from escrow, including $143.56 for "[d]ues, including interest and late charges," which was $183.35 less than the amount owing to release the lien in The Management Trust's February 6, 2012, report to Vial Fotheringham; $2,206.24 for "[a]ttorney fees and costs including release of liens"; and the $125.00 transfer fee. The first page of the payoff reflected the payoff was valid through February 29, 2012.  The subsequent pages of the payoff, however, contained the February 6, 2012, payoff accounting from The Management Trust that reflected $326.91 was owing to The Management Trust for release of the lien plus the additional $125.00 transfer fee.  This part of the payoff record represented it was valid through March 6, 2012.

On February 22, 2012, Plaintiff made his second payment of $366.69 to Vial Fotheringham.  Vial Fotheringham accepted that payment and noted on February 28, 2012, the receipt of Plaintiff's payment in the firm's trust-account records.

On Friday (February 24, 2012), almost one month after her
last email to which Knewtson did not respond, Montag emailed
Knewtson again:

> There seems to be some confusion as to the Agreement
> between your clients and mine. There was clearly some
> disagreement as to the terms of the Agreement and, as a
> result, none was reached with regard to the terms
> outside the exchange of correspondence between you and
> me. I have contacted you *several* times to clarify
> this, but you have neglected to return my telephone
> calls or reply to the e-mails I have sent.
>
> That said, it is our position that the Agreement we
> reached, if any, - the terms stated in the exchange of
> e-mails between you and me - discharges your clients of
> liability for assessments and related fees through
> December 31, 2011 and attorneys fees and costs through
> then. We have received the second payment from your
> clients as per the Agreement. But, your clients have
> not paid the quarterly assessments due on January 1,
> 2012. Thus, your clients are liable for those
> assessments and related fees and attorney's fees and
> costs. This becomes relevant because your clients
> requested a payoff to discharge the lien on the
> property. Because your clients are still liable for
> past due amounts, the lien remains a cloud on title to
> the property.
>
> Let me know if you no longer represent Mr. Porras and
> Ms. Gonzalez. I expect to hear from you *promptly*.

Approximately 20 minutes later Knewtson responded: "The
$48.50 payment was sent to your office, by mail, at the beginning
of January addressed to you. How much are you demanding in
attorney fees as a result of the 'missed payment'?" Montag
failed to respond to this crucial inquiry.

On February 29, 2012, Plaintiff received a copy of the
payoff sent by Vial Fotheringham and told First American that he

had recently made payments against the debt.  First American sent an email to Vial Fotheringham requesting an updated payoff.  With that email First American sent a copy of the receipts from Plaintiff's January and February 2012 payments.

On March 1, 2012, Vial Fotheringham sent an email to The Management Trust requesting an updated payoff.  The Management Trust, however, responded that it was no longer the managing company for the HOA.

On Friday, March 2, 2012, an employee of Vial Fotheringham spoke with an employee of the HOA's new management company.  The Vial Fotheringham employee noted the new management company employee told him that "as soon as they record payment of 2/28 on [the] ledger she will send an updated ledger to prepare updated payoff."  There are not any more notes regarding an updated payoff.

Plaintiff finalized the sale of his home in Oak Hill on Wednesday, March 7, 2012.  At that time Vial Fotheringham had not yet sent an updated payoff to First American.  Although Plaintiff believed the February 21, 2012, payoff from Vial Fotheringham was inaccurate, Plaintiff approved the payoff for the purpose of closing the sale of his home.

On March 8, 2012, Vial Fotheringham received three checks from First American.  The first check was made payable to Vial Fotheringham in the amount of $2,349.80, which was consistent

with the total amount to be sent to Vial Fotheringham pursuant to
the first page of the February 21, 2012, payoff.  The second
check was made payable to Oak Hill in the amount of $326.91,
which was consistent with The Management Trust's February 6,
2012, accounting, but inconsistent with Vial Fotheringham's
February 21, 2012, accounting.  The third check was made payable
to The Management Trust in the amount of $125.00.

On March 12, 2012, Vial Fotheringham forwarded to Oak Hill
checks in the amounts of $326.91 and $125.00.  On March 14, 2012,
Vial Fotheringham sent another check to Oak Hill in the amount of
$233.37, which was reflective of Plaintiff's January 25, 2012,
payment.  The cause of the delay between Vial Fotheringham's
receipt of Plaintiff's January 25, 2012, payment and forwarding
that portion of the payment to the HOA is unclear.  Vial
Fotheringham also forwarded to the HOA $356.80 of the $2,349.80
check and retained the remainder.

On March 30, 2012, Vial Fotheringham filed a satisfaction of
judgment in Washington County Circuit Court on behalf of the HOA.

On May 2, 2012, Plaintiff filed a motion to vacate judgment
in Washington County Circuit Court.  Montag, in her capacity as
attorney for the HOA, responded to the motion by arguing that the
motion was moot because the parties had settled the matter and
Vial Fotheringham had previously filed a satisfaction of judgment
on behalf of the HOA.  The court agreed with Montag and denied

Plaintiff's motion as moot on the basis of the putative settlement and satisfaction of judgment.

On August 20, 2012, Plaintiff dismissed his appeal of the supplemental judgment.

On January 7, 2013, Knewtson sent a letter to Vial Fotheringham on behalf of Plaintiff concerning the money taken from escrow. That letter is not in the record. In his deposition Plaintiff testified he waited until January 2013 to raise the issue with Vial Fotheringham because he had been busy with personal matters.

On January 31, 2013, Vial Fotheringham sent to Knewtson a letter with a check in the amount of $2,801.71. In that letter Vial Fotheringham stated:

> Vial Fotheringham received your letter dated January 7, 2013 regarding the matters raised in that letter. Tom Johnson from our office attempted to contact you both by telephone and by email, but has not received a response. I left a voice mail for you both yesterday and at about 1:10 pm today.
>
> As Tom Johnson mentioned in his email, and as I mentioned in my last telephone message to you, it appears Andrea Montag was the attorney handling the Porras matter at the time of the sale of the Porras residence in March 2012. She is no longer employed at Vial Fotheringham, having moved on a few months ago to another position elsewhere.
>
> I did not see a settlement agreement executed by the parties nor does it seem that you or your client raised an issue with Vial Fotheringham at the time of the sale that there was any mistake. Nonetheless, if there has been a mistake or some misunderstanding, we want to make it right.

> In an effort to bring this matter to a conclusion,
> enclosed is our firm check in the amount of $2,801.71
> to fully refund your clients the amount sent to Vial
> Fotheringham at the time of closing.  By negotiating
> the check, you and your clients agree that this fully
> resolves this matter.
>
> As I mentioned earlier, I preferred to discuss the
> matter with you by telephone, but you have not
> responded to us.

On February 20, 2013, Plaintiff filed this action in
Multnomah County Circuit Court.

On April 4, 2013, Knewtson wrote a letter to Vial
Fotheringham in which he stated:  "Enclosed is the check you
sent.  Mr. Porras is unwilling to accept the check on the stated
terms of your letter."

On April 25, 2013, Defendants removed the Multnomah County
action to this Court.

## STANDARDS

Summary judgment is appropriate when there is not a "genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  *Washington Mut. Ins. v. United
States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  *See also* Fed. R.
Civ. P. 56(a).  The moving party must show the absence of a
dispute as to a material fact.  *Rivera v. Philip Morris, Inc.*,
395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly
supported motion for summary judgment, the nonmoving party must
go beyond the pleadings and show there is a genuine dispute as to

a material fact for trial. *Id.* "This burden is not a light one
. . . . The non-moving party must do more than show there is
some 'metaphysical doubt' as to the material facts at issue." *In
re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)
(citation omitted).

A dispute as to a material fact is genuine "if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d
1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all
reasonable inferences in favor of the nonmoving party. *Sluimer
v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary
judgment cannot be granted where contrary inferences may be drawn
from the evidence as to material issues." *Easter v. Am. W. Fin.*,
381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts
Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598
(9th Cir. 1982)).

A "mere disagreement or bald assertion" that a genuine
dispute as to a material fact exists "will not preclude the grant
of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No.
2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20,
2011)(citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.
1989)). *See also Moore v. Potter*, 701 F. Supp. 2d 1171 (D. Or.
2010). When the nonmoving party's claims are factually

implausible, that party must "come forward with more persuasive
evidence than otherwise would be necessary."  *LVRC Holdings LLC
v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citing *Blue Ridge
Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense
determines whether a fact is material.  *Miller v. Glenn Miller
Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the
resolution of a factual dispute would not affect the outcome of
the claim, the court may grant summary judgment.  *Id.*

## DISCUSSION

In his Second Amended Complaint (#53) Plaintiff alleges in
Claim One that Plaintiff asserts Defendants' actions violated
several subsections of the Fair Debt Collection Practices Act
(FDCPA), 15 U.S.C. § 1692, *et seq.*  In Claim Two Plaintiff
alleges Defendants' actions violated the Oregon Unfair Debt
Collection Practices Act (OUDCPA), Oregon Revised Statute
§ 646.639.  In Claim Three Plaintiff asserts Defendants' actions
give rise to claims for "money had and received or conversion."

The myriad claims, subclaims, factual bases, and defenses
raised by the parties on summary judgment, however, make elusive
and impractical any comprehensive attempt to resolve the merits
of the parties' Cross Motions, especially in light of the fact
that there are many issues that the parties have not adequately

addressed in spite of unusually extensive briefing and re-
briefing.  Accordingly, in this Opinion and Order the Court only
addresses and resolves the following three issues:  (1) Whether
delinquent HOA assessments and associated fees and costs are a
"debt" to which the FDCPA applies; (2) whether Defendants were
required to send a new initial notice letter under 15 U.S.C.
§ 1692g after Plaintiff's payment of the alleged settlement and
before Defendants received the escrow payment; and (3) whether
the parties reached an enforceable settlement agreement between
December 2011 and Plaintiff's sale of the property in March 2012
and, if so, on what terms.

## I.    Applicability of the FDCPA

As an initial matter Defendants contend the FDCPA does not
apply to Plaintiff's claims because the delinquent HOA
assessments and associated fees and costs are not a "debt" within
the meaning of the FDCPA, and, therefore, Defendants are entitled
to summary judgment on Claim One because Plaintiff's FDCPA claims
fail as a matter of law.

"Because not all obligations to pay are considered debts
under the FDCPA, a threshold issue in a suit brought under the
Act is whether or not the dispute involves a 'debt' within the
meaning of the statute."  *Turner v. Cook*, 362 F.3d 1219, 1226-27
(9th Cir. 2004).  The FDCPA defines "debt" as "any obligation or
alleged obligation of a consumer to pay money arising out of a

25 - OPINION AND ORDER

transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5).

Defendants specifically contend HOA assessments and associated fees and costs are not a "debt" because they (1) do not arise out of a "transaction" and (2) are not "primarily for personal, family, or household purposes." *See id.*

### A. Whether the HOA assessments are a "transaction" under the FDCPA.

Defendants first contend the HOA assessments and associated fees and costs did not arise out of a "transaction" within the meaning of the FDCPA.

"The ordinary meaning of 'transaction' necessarily implies some type of business dealing between the parties . . . . In other words, when we speak of 'transactions' we refer to consensual or contractual arrangements, not damage obligations thrust upon one as a result of no more than her own negligence." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1371 (11th Cir. 1998). *See also Turner*, 362 F.3d at 1227 (adopting *Hawthorne's* definition of "transaction").

The Sixth and Seventh Circuits have concluded the nonpayment of HOA assessments gives rise to a "debt" within the meaning of the FDCPA because the liability arises from the original transaction of purchasing a home in the homeowners' association.

26 - OPINION AND ORDER

*Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 698 F.3d 290, 294 (6th Cir. 2012); *Newman v. Boehm, Pearlstein & Bright, Ltd.,* 119 F.3d 477, 481 (7th Cir. 1997). This Court finds the reasoning in *Haddad* and *Newman* to be persuasive.

Defendants, however, rely primarily on *Mlnarik v. Smith, Gardner, Slusky, Lazer, Pohren & Rogers, LLP*, No. 14-cv-01849-BLF, 2014 WL 6657747, at *3-*4 (N.D. Cal. Nov. 21, 2014), and similar cases from district courts across the country to support their position. Defendants contend the nonpayment of HOA assessments does not give rise to a "debt" because the unpaid assessments do not arise out of a consensual transaction. Defendants' reliance on *Mlnarik* is misplaced, however, because in that case the plaintiffs' duty to pay *fines* "did not arise out of the Plaintiffs' purchase of the Property, and instead came about because of Plaintiffs' subsequent breach of other obligations they made when they purchased the Property." *Id.,* at *3. In fact, the *Mlnarik* court distinguished *Haddad* and *Newman* because "[n]othing in this case suggests that Defendants' collection efforts pertained to homeowners' association assessments." *Id.* Accordingly, *Mlnarik* and similar cases do not undermine the reasoning of the Sixth and Seventh Circuits in *Haddad* and *Newman*.

Defendants also contend even if the HOA assessments arise from a transaction, the associated late fees, attorneys' fees, and collection costs do not arise from any transaction and are

more like the fines at issue in *Mlnarik*. Although Defendants may be correct in their position that late fees, attorneys' fees, and collection costs do not, in isolation, arise from a transaction, there is nothing in the FDCPA definition of a "debt" that requires the liability to arise directly out of a transaction. *See Medialdea v. Law Office of Evan L. Loeffler, PLLC*, No. C09-55RSL, 2009 WL 1767185, at *3 (W.D. Wash. June 19, 2009). In fact, the FDCPA definition of "debt" speaks in broad terms by including "*any* obligation . . . arising out of a transaction." *See* 15 U.S.C. § 1692a(5) (emphasis added). When, as here, the late fees, attorneys' fees, and collection costs are all associated with an obligation that arises directly out of a transaction (*i.e.*, the payment of HOA assessments associated with the purchase of a home), the fees and costs similarly arise out of a "transaction" under the FDCPA.

Accordingly, on this record the Court concludes the HOA assessments and the associated fees and costs arise out of the "transaction" that was Plaintiff's purchase of the property in Oak Hill, and to that extent the Court concludes Plaintiff is entitled to summary judgment.

**B.    Whether the HOA assessments were for "personal, family, or household" purposes.**

Defendants contend the nonpayment of the HOA assessments did not create a "debt" under the FDCPA in light of the fact that HOA assessments were not paid "primarily for personal, family, or

household purposes" (*see* 15 U.S.C. § 1692a(5)) because the HOA

assessments were not specifically used to maintain Plaintiff's

home; they were not for personal, family, or household purposes;

and, in any event, the associated fees and costs were not for

such purposes even if the HOA assessments were.

The Court finds persuasive the reasoning of the Seventh

Circuit in *Newman* as follows:

> To the extent that the assessments were to be used to
> improve or maintain commonly-owned areas, that purpose,
> too, qualifies as "personal, family, or household."  In
> our view, when a special assessment is used to repair a
> common roof, or a monthly assessment is used to pay for
> services like snow removal from a common walkway or
> landscaping of a common yard, the assessments are for a
> household purpose even if more than a single household
> benefits.  We thus are unable to agree with defendants'
> suggestion that because all unit owners benefit,
> assessments like these can be likened to past-due tax
> obligations, which are not considered "debts" under the
> Act because they generally are used for communal rather
> than personal, family, or household purposes.

119 F.3d at 481.  Even though the parties agree the HOA

assessments were not used specifically to maintain the property

of Plaintiff or any other individual homeowner, they were used to

maintain common areas and to administer the HOA.  It is also

undisputed that each homeowner within Oak Hill had an ownership

interest in the common areas appurtenant to the homeowner's own

property as well as the right to use and to benefit from those

common areas.  Moreover, it is undisputed that Plaintiff and his

family used the common areas in Oak Hill, including the park in

which Plaintiff's children played.  Accordingly, based on the

29 - OPINION AND ORDER

persuasive reasoning of *Newman*, the Court concludes the HOA assessments were paid primarily for personal, family, or household purposes.

For the same reasons the Court rejects Defendants' distinction between the unpaid HOA assessments and the associated late fees, attorneys' fees, and collection costs.

Accordingly, on this record the Court concludes Plaintiff is entitled to summary judgment that the unpaid HOA assessments and associated fees and costs constituted a "debt" within the meaning of the FDCPA because the assessments, fees, and costs arose from a "transaction" and were "primarily for personal, family, or household purposes." *See* 15 U.S.C. § 1692a(5).

In summary, the Court concludes the delinquent HOA assessments and the associated fees and costs were a "debt" within the meaning of the FDCPA because the assessments, fees, and costs arose out of a transaction and were primarily for personal, family, or household purposes.

## II.  Notice Required by 15 U.S.C. § 1692g

Plaintiff contends he is entitled to summary judgment as to liability on the portion of Claim One in which Plaintiff alleges Defendants failed to provide Plaintiff with legally sufficient notice as to his right to dispute the debt before collecting Plaintiff's monies from escrow.  Plaintiff specifically argues his payment of the alleged settlement in February 2012 rendered

any additional collections by Defendants to be collections of a
new debt that required a separate notice under § 1692g.

Defendants, in turn, contend they are entitled to summary
judgment on the portion of Plaintiff's Claim One that alleges a
violation of § 1692g because Defendants provided the statutorily-
required notice in their initial letter to Plaintiff on
December 7, 2009.

Section 1692g provides:

> Within five days after the initial communication with a
> consumer in connection with the collection of any debt,
> a debt collector shall, unless the following
> information is contained in the initial communication
> or the consumer has paid the debt, send the consumer a
> written notice containing--
>
> * * *
>
> (3) a statement that unless the consumer, within thirty
> days after receipt of the notice, disputes the validity
> of the debt, or any portion thereof, the debt will be
> assumed to be valid by the debt collector; [and]
>
> (4) a statement that if the consumer notifies the debt
> collector in writing within the thirty-day period that
> the debt, or any portion thereof, is disputed, the debt
> collector will obtain verification of the debt or a
> copy of a judgment against the consumer and a copy of
> such verification or judgment will be mailed to the
> consumer by the debt collector.

15 U.S.C. § 1692g(a)(3), (4).

It is undisputed that Vial Fotheringham sent to Plaintiff a
letter on December 7, 2009, that stated the amount of the debt,
advised Plaintiff that additional costs and fees could be
incurred on the debt, and notified Plaintiff of his right to

dispute the debt.  Plaintiff does not dispute the December 7, 2009, letter met the technical requirements of § 1692g.  Instead Plaintiff contends Defendants were required to send a separate § 1692g letter after the putative settlement and before Defendants collected the remainder of the alleged debt from escrow.  In particular, Plaintiff argues Vial Fotheringham's response to First American's payoff request was the initial communication with a debtor that triggered Vial Fotheringham's duty to send Plaintiff a § 1692g letter.

Plaintiff's contention, however, is foreclosed by the plain meaning and purpose of the statute.  Vial Fotheringham sent the necessary § 1692g letter to Plaintiff in December 2009.  As noted, under the FDCPA a "debt" is "any obligation or alleged obligation of a consumer to pay money arising out of a transaction."  15 U.S.C. § 1692a(5).  Ultimately, the purpose of § 1692g is to "ensure[] that consumers receive notice of their rights of verification and to dispute the debt."  *Russell v. Absolute Collections Servs., Inc.*, 763 F.3d 385, 395 (4th Cir. 2014).

Although the parties now dispute the effect that the settlement negotiations had on Plaintiff's debt and whether Defendants could thereafter collect any further sums from escrow, it is undisputed that the debt (whether valid or invalid) collected by Vial Fotheringham from escrow on behalf of the HOA

arose from the same transaction that was the subject of Vial
Fotheringham's December 2009 notice letter (*i.e.*, the nonpayment
of Plaintiff's HOA assessments and the associated fees and
costs).  Moreover, the lien that the escrow funds were to
extinguish was the same lien that the HOA placed on Plaintiff's
property in September 2009.  Thus, for purposes of § 1692g, the
Court concludes the debt that Vial Fotheringham collected from
escrow was the same debt that was the subject of Vial
Fotheringham's December 2009 § 1692g notice.

The Court also concludes Plaintiff's contention that the
February 21, 2012, payoff accounting was an "initial
communication" of a new debt fails.  Plaintiff did not make his
second payment on any putative settlement until February 22,
2012, the day after Vial Fotheringham sent its payoff accounting
to First American.  Plaintiff does not identify any provision in
any putative settlement that would require Vial Fotheringham to
discharge the remainder of Plaintiff's debt before Plaintiff
fully performed the contract.  Accordingly, Vial Fotheringham's
February 21, 2012, payoff accounting could not have been an
"initial communication" regarding a new debt because even under
Plaintiff's theory of the settlement the old debt had not yet
been discharged.

Finally, finding a violation of § 1692g in these
circumstances would not serve the purpose of § 1692g.  Not only

was Plaintiff on notice of his right to dispute and to validate the debt, but Plaintiff (through Knewtson) had been disputing and ultimately attempting to resolve the debt with Defendants.  Thus, Defendants did not violate § 1692g by failing to send to Plaintiff a redundant notice after Plaintiff's escrow agent requested an accounting of the balance remaining on the lien that encumbered Plaintiff's property.

Accordingly, on this record the Court concludes Defendants are entitled to partial summary judgment on that portion of Claim One in which Plaintiff alleges Defendants violated § 1692g by providing Plaintiff with inadequate notice.

## III. Formation of a Settlement Agreement

Central to many of Plaintiff's claims is his contention that he and Vial Fotheringham entered into an enforceable settlement agreement that discharged Plaintiff's debt before the closing of the sale of Plaintiff's home.

Under the FDCPA the existence of a debt is determined by the underlying contract and applicable state law.  *See De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1074 (9th Cir. 2011).  Thus, whether the parties entered into an enforceable settlement agreement is determined by state law.

"Whether a binding contract exists between the parties is a question of law."  *Citibank of South Dakota N.A. v. Santoro*, 210 Or. App. 344, 348 (2006).  "A valid contract can be created 'by

34 - OPINION AND ORDER

[an] offer and its unqualified acceptance.'" *Bridge City Family Med. Clinic, P.C. v. Kent & Johnson, LLP*, 270 Or. App. 115, 121 (2015)(quoting *Williams v. A.C. Burdick & Co.*, 63 Or. 41, 49 (1912)). "Oregon subscribes to the objective theory of contract, which provides that the existence and terms of a contract are determined by evidence of the parties' communications and acts." *Rhoades v. Beck*, 260 Or. App. 569, 572 (2014). Accordingly, the parties' "objective manifestations of intent control rather than the parties' uncommunicated subjective understanding." *Butler Block, LLC v. Tri-County Metropolitan Transp. Dist. of Oregon*, 242 Or. App. 395, 410 (2011). "Those manifestations of intent must show that there has been a 'meeting of the minds' as to the contract's terms and that no material terms remain for future negotiation." *Bridge City Family Med. Clinic*, 270 Or. App. at 121. In addition to an explicit communication of the acceptance, "[c]onduct can manifest acceptance of an offer." *Citibank of South Dakota*, 210 Or. App. at 349.

The parties dispute whether and on what terms they entered into a valid settlement agreement. The record on these Cross-Motions certainly makes clear that throughout the early course of the email exchanges between Knewtson and Montag, the parties' initial objective manifestations never reflected there was a "'meeting of the minds' as to the contract's terms and that no material terms remain[ed] for future negotiation." *See Bridge*

35 - OPINION AND ORDER

*City Family Med. Clinic*, 270 Or. App. at 121.  Indeed, Knewtson and Montag appeared to continue to negotiate terms through Knewtson's January 27, 2012, email that included his proposed settlement agreement.

As noted, on January 26, 2012, Montag emailed Knewtson to inquire about the check that Vial Fotheringham received from Plaintiff that day and stated Vial Fotheringham would not process the payment until it received a signed settlement agreement. Although the next day (January 27, 2012) Knewtson initially responded to Montag's email glibly, later that day Knewtson sent a proposed settlement agreement that contained a full statement of material terms.  Knewtson expressly noted there was not any agreement as to any terms outside of that writing in response to Montag's inquiry about the payment and a signed settlement agreement.

The record, nonetheless, clearly indicates Vial Fotheringham processed the payment on February 14, 2012, which is conduct manifesting acceptance of Plaintiff's offer to settle according to the terms of the January 27, 2012, proposed settlement, especially in light of the fact that Montag previously said Defendants would not process Plaintiff's payment until Defendants received a signed settlement agreement.  Accordingly, on this record the Court concludes Plaintiff and Defendants reached an enforceable settlement agreement according to the terms of the

36 - OPINION AND ORDER

January 27, 2012, proposed agreement when Vial Fotheringham processed that payment.

Although the terms of that settlement agreement provided for the timing of Plaintiff's performance, it did not explicitly provide for the timing of Defendants' performance (*i.e.*, when Defendants were required to discharge Plaintiff's debt). "A contract that is silent with regard to the time of performance must be performed within a reasonable time, and reasonableness is determined by reference to all the facts and circumstances." *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or. 270, 283 (2011). Defendants, therefore, were required to release Plaintiff from the remainder of the debt within a reasonable time after Plaintiff made his final payment.

In summary, on this record the Court concludes Plaintiff is entitled to partial summary judgment that he and Defendants entered into a settlement agreement pursuant to the terms of the January 27, 2012, proposed settlement by which Plaintiff was required to make payments on January 31, 2012, and February 29, 2012, and Defendants were required to discharge the debt within a reasonable time after Plaintiff made his final payment.

## CONCLUSION

For these reasons, the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion (#103) for Partial Summary Judgment.

37 - OPINION AND ORDER

Specifically, the Court **GRANTS** Plaintiff's Motion insofar as
(1) the unpaid HOA assessments and associated fees and costs
constituted a "debt" within the meaning of the FDCPA and (2) the
parties settled the underlying debt according to the terms of the
January 27, 2012, proposed settlement agreement, but the Court
**DENIES** Plaintiff's Motion in all other respects with leave to
renew as to those issues that the Court did not address in this
Opinion and Order.

The Court also **GRANTS in part** and **DENIES in part** Defendants'
Motion (#109) for Partial Summary Judgment.  Specifically, the
Court **GRANTS** Defendants' Motion for Partial Summary Judgment as
to Plaintiff's claim that Defendants failed to provide sufficient
notice under 15 U.S.C. § 1692g and **DENIES** Defendants' Motion in
all other respects with leave to renew as to those issues that
the Court did not address in this Opinion and Order.

The Court directs the parties to confer to determine whether
the matter is now ready for a pretrial order or whether
additional dispositive-motion practice on a clearer record is
warranted as to issues the Court did not address in this Opinion
and Order.  Following their conferral, the parties must file a
single joint status report no later than **June 12, 2015,** to
include case-management recommendations.  If the parties seek to
engage in additional dispositive-motion practice, the parties
must specify in the joint status report each issue on which they

seek a dispositive ruling.    After the Court reviews the report, a case-management conference will be scheduled.

IT IS SO ORDERED.

DATED this 21st day of May, 2015.


ANNA J. BROWN
United States District Judge